**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JONNIE HELFRICH, Individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>     v.<br><br>TRINSEO PLC, FRANK A. BOZICH, and DAVID STASSE,<br><br>     Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Jonnie Helfrich ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Trinseo PLC ("Trinseo" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Trinseo securities between May 3, 2021 and March 27, 2023, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages

caused by Defendant's violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act")

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff Jonnie Helfrich, as set forth in the accompanying certification, incorporated by reference herein, purchased Trinseo securities during the Class Period and was economically damaged thereby.

7.      Defendant Trinseo purports to be a "specialty material solutions provider with a focus on partnering with companies to bring ideas to life in an imaginative, smart, and sustainability-focused manner. We have leading market positions in many of the markets in which we compete. Our products are incorporated into a wide range of our

customers' products throughout the world, including products for automotive applications, consumer electronics, appliances, medical devices, packaging, footwear, carpet, paper and board, building and construction, and wellness, among others. [. . .]."

8.     Trinseo is incorporated in Ireland and its head office is located at 440 East Swedesford Road, Suite 301, Wayne, Pennsylvania 19087. Trinseo's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "TSE."

9.     Defendant Frank A. Bozich ("Bozich") has served as the Company's Chief Executive Officer ("CEO") and President since March 2019

10.     Defendant David Stasse ("Stasse") has served as the Company's Chief Financial Officer and Executive Vice President since July 2019

11.     Defendants Bozich and Stasse are collectively referred to herein as the "Individual Defendants."

12.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

13.     Trinseo is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

14.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

15.     Trinseo and the Individual Defendants are collectively referred to herein as "Defendants."

## **SUBSTANTIVE ALLEGATIONS**

**Materially False and Misleading Statements**
**Issued During the Class Period**

16.     On May 3, 2021, the Company filed with the SEC a current report on Form 8-K announcing that it had completed its "previously-announced acquisition of the polymethyl methacrylates (PMMA) and activated methyl methacrylates (MMA) business of Arkema S.A., [. . .] through the purchase of certain subsidiaries of Arkema." This deal (the "Arkema Acquisition") included Arkema's manufacturing facility in Bristol, Pennsylvania.

17.     In an accompanying press release, which did not discuss prior issues at the

4

Bristol plant, Defendant Bozich stated "[t]oday is a special day. I am thrilled to welcome our new colleagues and customers to the Trinseo family, as we embark on this transformation journey together[.] This journey will bring us closer to our customers; create a more sustainable, environmentally-friendly footprint; and shorten the cycles of innovation that accelerate the process of bringing new, industry-leading solutions to market."

18.     Then, on May 7, 2021, Trinseo filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2021 (the "1Q21 Report"). Attached to the 1Q21 Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Bozich and Stasse attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

19.     The 1Q21 Report incorporated by reference the Risk Disclosures from the Company's Annual Report for the year ended December 31, 2020 (the "2020 Annual Report").

20.     The 2020 Annual Report stated risks relating to the then-proposed acquisition of Arkema's PMMA and MMA businesses, but did not state any risks relating specifically to the Bristol plant and its safety record, stating, in pertinent part:

> **We face risks concerning our recently announced proposed acquisition of assets from Arkema, S.A.**
>
> On December 14, 2020, we entered into a binding offer to acquire the Arkema business for a purchase price of €1.137 billion (the "Arkema Acquisition"). Pursuant to such offer, we entered into a put option agreement with Arkema (the "Put Option") which includes a securities purchase agreement ("SPA") and warranty agreement ("Warranty Agreement"). The Put Option provides Arkema the right to deliver a put option exercise notice within 10 business days of the completion of certain consultation processes with works councils, upon which we

will execute and deliver the SPA and Warranty Agreement on the date and location set forth in the put option exercise notice. Once signed, the parties' obligations to complete the transaction under the SPA will be subject to the absence of a material adverse change, the completion of certain pre-closing reorganizations, the receipt of certain antitrust clearances and other customary conditions and approvals, as well as the provision of certain financial information and cooperation with our arrangement of debt financing to fund the acquisition.

The Arkema Acquisition is expected to close in mid-2021, subject to these and other closing conditions. Not all of these closing conditions are within our control. It is possible that certain conditions or events may prevent, delay or otherwise materially adversely affect the completion of the Arkema Acquisition. We cannot predict with certainty whether and when any of the remaining required closing conditions will be satisfied, including the procurement of all antitrust, works councils and other regulatory approvals, or whether Arkema and the Company will be able to meet their pre-closing conditions. If the Arkema Acquisition does not receive required regulatory approvals, if a material adverse change occurs, or if another event occurs that delays or prevents the acquisition, our ability to complete the Arkema Acquisition could be materially adversely impacted. If the Company is unable to secure the financing necessary to fund the Arkema Acquisition, at terms acceptable to the Company, due to its failure to successfully access financial markets, failure by Arkema to meet its obligations under the SPA, adverse market conditions, or otherwise, we could fail to complete the Arkema Acquisition. Any such delay or failure to complete the Arkema Acquisition could cause uncertainty or other negative consequences that may materially and adversely affect our business, financial condition and results of operations and, to the extent that the current price of the Company's common shares reflects an assumption that the Arkema Acquisition will be completed, the price of the Company's common shares could be negatively impacted.

**We may fail to realize the anticipated benefits of the Arkema Acquisition or such benefits may take longer to realize than expected. We may also encounter difficulty integrating the Arkema business into our operations.**

Our ability to realize the anticipated benefits of the Arkema Acquisition will depend on our ability to integrate the Arkema business into ours. Combining these businesses will be a complex and time-consuming process. As a result, we expect to devote significant attention and resources preparing for and then integrating the operations, systems, processes, procedures and personnel of the acquired Arkema business. This integration process may be disruptive to our ongoing business, and, if we fail to effectively integrate, or if integration takes longer or is more costly than expected, we could lose or diminish the expected benefits of the Arkema Acquisition. Even if we are able to integrate the Arkema business successfully, this integration may not result in the realization of the synergies and benefits that we currently expect, nor can we give assurances that these benefits will be achieved when expected or at all.

6

We also face risks that the post-acquisition Company may fail to meet its financial and strategic goals, due to, among other things, inability to grow and manage growth profitability, maintain relationships with customers or retain key employees. The post-acquisition Company may also be adversely affected by other economic, business, and/or competitive factors which may not exist at the time of closing. Such conditions could materially adversely impact our business and results of operations. Further, costs of the acquisition could greatly exceed our anticipated costs, which could have a material adverse impact on our financial condition.

21.     The 2020 Annual Report contained the following risk disclosure related to production at the Company's manufacturing facilities. While the Company disclosed general risks and hazards (including safety issues) from engaging in chemical manufacturing, it had not been updated for the 1Q21 Report to disclose that the Company was, by that time, at a heightened risk of a chemical spill by virtue of acquiring the Bristol facility as part of the Arkema Acquisition. The 2020 Annual Report stated, in pertinent part:

**Production at our manufacturing facilities could be disrupted for a variety of reasons. Disruptions could expose us to significant losses or liabilities.**

The hazards and risks of disruption associated with chemical manufacturing and the related storage and transportation of raw materials, products and wastes exist in our operations and the operations of other occupants with whom we share manufacturing sites. These potential risks of disruption include, but are not necessarily limited to:
- pipeline and storage tank leaks and ruptures;
- explosions and fires;
- inclement or extreme weather and natural disasters, which may be aggravated by climate change;
- disease outbreaks, epidemics or pandemics, and government responses thereto, which may impact our employees or those of our suppliers or transportation providers;
- terrorist attacks;
- cyber-attacks;
- failure of mechanical systems, computer systems, process safety and pollution control equipment;
- failures or delays in properly implementing new technologies and processes;

- chemical spills and other discharge or releases of toxic or hazardous substances or gases; and
- exposure to toxic chemicals.

These hazards could expose employees, customers, the community and others to toxic chemicals and other hazards, contaminate the environment, damage property, result in personal injury or death, lead to an interruption or suspension of operations, damage our reputation and adversely affect the productivity and profitability of a particular manufacturing facility or us as a whole, and result in the need for remediation, governmental enforcement, regulatory shutdowns, the imposition of government fines and penalties, and claims brought by governmental entities or third parties. Legal claims and regulatory actions could subject us to both civil and criminal penalties, which could affect our product sales, reputation and profitability. Furthermore, the environmental, health and safety compliance, management systems, and emergency response and crisis management plans we have in place may not address or foresee all potential risks or causes of disruption.

If disruptions occur, alternative facilities with sufficient capacity or capabilities may not be available, may cost substantially more or may take a significant time to start production. Each of these scenarios could negatively affect our business and financial performance. If one of our key manufacturing facilities is unable to produce our products for an extended period of time, our sales may be reduced by the shortfall caused by the disruption and we may not be able to meet our customers' needs, which could cause them to seek other suppliers. Furthermore, to the extent a production disruption occurs at a manufacturing facility that has been operating at or near full capacity, the resulting shortage of our product could be particularly harmful because production at the manufacturing facility may not be able to reach levels achieved prior to the disruption. Our insurance policies may not fully insure against all potential causes of disruption due to limitations and exclusions in those policies. Therefore, incidents that significantly disrupt our operations may expose us to significant losses and/or liabilities.

22.     Then, on August 5, 2021, Trinseo filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2021 (the "2Q21 Report"). Attached to the 2Q21 Report were certifications pursuant SOX signed by Defendants Bozich and Stasse attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

23. The risk disclosures contained in the 2Q21 Report pertaining to the Arkema Acquisition focused on how the Company may fail to realize anticipated benefits of the deal, rather than any unique risks relating to the Bristol plant.

24. Then, on November 8, 2021, Trinseo filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 Report"). Attached to the 3Q21 Report were certifications pursuant SOX signed by Defendants Bozich and Stasse attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

25. The risk disclosures contained in the 3Q21 Report pertaining to the Arkema Acquisition focused on how the Company may fail to realize anticipated benefits of the deal, rather than any unique risks relating to the Bristol plant.

26. In addition, the 3Q21 Report incorporated by reference the additional risk disclosures (including those on production, as stated above) from the 2020 Annual Report, which did not disclose unique risks at the Bristol facility.

27. On February 23, 2022, Trinseo filed with the SEC its annual report on Form 10-K for the year ended December 31, 2021 (the "2021 Annual Report"). Attached to the 2021 Annual Report were certifications pursuant to SOX signed by Defendants Bozich and Stasse attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

28. The 2021 Annual Report contained substantially similar risk disclosures as the 2020 Annual Report with regard to disruption at the Company's manufacturing

facilities. As such, while the Company disclosed general risks and hazards (including safety issues) from engaging in chemical manufacturing, it did not disclose that the Company was at a heightened risk of a chemical spill by virtue of acquiring the Bristol facility through the Arkema Acquisition.

29.     The risk disclosures contained in the 2021 Annual Report specifically related to the Arkema Acquisition focused on risks related to the possible failure of realizing anticipated benefits from the Arkema Acquisition, rather than risks related to the Bristol Facility.

30.     The risk disclosures contained in the 2022 quarterly filings filed with the SEC on Form 10-Q on May 5, 2022 (reporting for March 31, 2022, the "1Q22 10-Q"), on August 9, 2022 (reporting for June 30, 2022, the "2Q22 10-Q") and November 4, 2022 (reporting for September 30, 2022, the "3Q22 10Q") similarly failed to disclose specific risks relating to the Company's operations at its Bristol, Pennsylvania facility.

31.     On February 27, 2023, Trinseo filed with the SEC its annual report on Form 10-K for the year ended December 31, 2022 (the "2022 Annual Report"). Attached to the 2022 Annual Report were certifications pursuant to SOX signed by Defendants Bozich and Stasse attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

32.     The 2022 Annual Report contained substantially similar risk disclosures as the 20201 Annual Report with regard to disruption at the Company's manufacturing facilities. As such, while the Company disclosed general risks and hazards (including safety issues) from engaging in chemical manufacturing, it did not disclose that the

Company was at a heightened risk of a chemical spill by virtue of acquiring the Bristol facility through the Arkema Acquisition.

33.     The statements contained in ¶¶ 16-33 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's Bristol, Pennsylvania plant had a troubled safety record while under prior ownership and continued to be unsafe after the Company acquired it; (2) Defendants did not sufficiently disclose specific risks related to conducting operations at that plant; (3) Operating a chemical plant with an unsafe history and presently unsafe operations exposed the Company to a heightened risk of a chemical spill or other adverse event; and (4) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all times.

## THE TRUTH BEGINS TO EMERGE

34.     On March 26, 2023, the Company published an announcement on its website that stated, in pertinent part: "Altuglas, a subsidiary of Trinseo, is working with local, state and federal agencies to clean up the release of a latex emulsion product from its manufacturing facility in Bristol, PA. The release, which occurred Friday evening, March 24, appears to be the result of an equipment failure. Some of the material overflowed the on-site containment system and entered a storm drain, where it flowed to Otter Creek and then to the Delaware River. No injuries were reported as a result of the release or the cleanup activities. Altuglas, a subsidiary of Trinseo PLC, notified

authorities of the release and took steps to prevent the further migration of material to the storm drain. Trinseo estimates that 8,100 gallons of solution — approximately 50% water and the remainder latex polymer — was spilled."

35.    This spill resulted in warnings to residents in the Philadelphia metropolitan region and surrounding areas, during which time residents were warned through alert-style text messages about potential safety issues regarding tap water. As a result, residents rushed to local stores to buy bottled water.

36.    On March 27, 2023, *The Philadelphia Inquirer* released an article entitled "Bristol plant that spilled chemicals into Philly's water supply had other mishaps over the last decade." The article stated that the toxic spill was caused at a chemical plant owned by Trinseo and located in Bristol, Pennsylvania, and stated, in pertinent part, "[t]hroughout its history the site has been subject to frequent monitoring by government regulators. Over the past decade, the U.S. Coast Guard twice before detected releases of acrylates from the Bristol facility into the Delaware."

37.    The article discussed prior spills at the site while it was under different ownership, including a 2010 "release" of 1,760 pounds of methyl methacrylate during transfer to a storage tank, which the EPA later said led to "the excavation and disposal of the contaminated soil", releases of butyl acrylate and ethyl acrylate, which required mediation between 2012 and 2013, as well as a 2014 release of 300 gallons of ethyl acrylate. The 2014 release triggered a facility evacuation as well as a shelter-in-place order for a local school.

38.     The article further stated that "[i]n early 2021, the Coast Guard identified an Arkema pipeline at the facility as the source of another leak involving an unknown quantity of methyl methacrylate."

39.     The article quoted David Salas-de la Cruz, a Rutgers University associate professor who worked at the same plant when it was owned by a separate company, as saying that the number of incidents at the plant was unusual. He specifically stated, "[t]hat's a lot. That's not normal. That's too many incidents involving similar chemicals." He further called into question the safety of reopening the plant after the 2021 spill, stating, in pertinent part, "[w]hen I was at Rohm & Haas, safety was their first priority, [b]ut they've already opened again. The question is, did they fix the problem? And was this burst related to the prior incidents?"

40.     On this news, Trinseo's stock fell $1.09 per share on March 27, 2023, or 5.2%, damaging investors.

41.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and the other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Trinseo securities publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual

Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

43.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

44.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

45.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements

14

made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

47.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

48.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's securities met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

- as a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination

of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

49.    Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

50.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

### COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

51.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

16

52.     This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

53.      During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

54.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

55.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information

17

reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

56.     Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

57.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

58.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

18

59.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

60.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

### COUNT II
#### Violations of Section 20(a) of the Exchange Act
#### Against the Individual Defendants

61.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

62.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

63.     As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

64.     Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations.

Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

65.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of herself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated:                                        **THE ROSEN LAW FIRM, P.A.**

Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com

Phillip Kim
275 Madison Ave., 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com

*Counsel for Plaintiff*